**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| LAURI JON BECKSTROM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19CV746 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND RECOMMENDATION**</u>
<u>**OF UNITED STATES MAGISTRATE JUDGE**</u>

Plaintiff, Lauri Jon Beckstrom, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, determining that Plaintiff's entitlement to Disability Insurance Benefits ("DIB") ended on September 1, 2015. (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 11 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 15; <u>see also</u> Docket Entry 14 (Plaintiff's Brief); Docket Entry 16 (Defendant's Memorandum); Docket Entry 17 (Defendant's Suggestion of

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Subsequently Decided Authority)).  For the reasons that follow, the Court should enter judgment for Defendant.

## I.  PROCEDURAL HISTORY

Plaintiff initially applied for DIB, alleging a disability onset date of January 1, 2009, which resulted in an Administrative Law Judge ("ALJ") decision denying benefits dated May 26, 2011. (See Tr. 41, 59, 85, 498.)[2]  Plaintiff did not pursue that application further, but instead filed a new application for DIB, alleging disability since January 10, 2006.  (Tr. 382-85.)[3]  Upon denial of that application initially and on reconsideration (Tr. 176, 822-23), Plaintiff requested a hearing de novo before an ALJ (Tr. 177-78).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 39-52.)  On July 24, 2013, the ALJ determined that Plaintiff qualified as disabled under the Act as of May 27, 2011, but recommended a Continuing Disability Review ("CDR") within 18 months.  (Tr. 134-43.)

On September 23, 2015, the Social Security Administration ("SSA") sent Plaintiff a Notice of Disability Cessation advising her that, as a result of the CDR which showed medical improvement

---

[2] The record does not contain any documents from Plaintiff's initial claim for DIB.  Further, although a subsequent ALJ and Plaintiff's attorney both stated that the Social Security Administration ("SSA") approved Plaintiff's initial claim for benefits (see Tr. 149; see also Docket Entry 14 at 1), the record clarifies in multiple places that the SSA in fact denied Plaintiff's first DIB claim (see Tr. 41, 59, 85, 498).

[3] Upon the advice of counsel, Plaintiff amended her onset date to May 27, 2011, the day after the prior ALJ decision denying benefits.  (See Tr. 41, 138, 384.)

2

in her condition, she stopped qualifying for DIB as of September 2015. (Tr. 189-92; see also Tr. 114-30, 131.) Following denials of her challenge to that determination at the reconsideration level (Tr. 194, 695-713) and by a Disability Hearing Officer (Tr. 133, 211-36), Plaintiff sought a hearing before an ALJ (Tr. 238).

A new ALJ held a hearing, attended by Plaintiff, her attorney, and a VE, and ordered consultative neurological and psychological examinations for Plaintiff. (Tr. 53-73.) Following those examinations, the ALJ convened a supplemental hearing, also attended by Plaintiff, her attorney, and a VE. (Tr. 72-82.) That ALJ then determined that Plaintiff's disability ended as of September 23, 2015 (Tr. 146-64), and Plaintiff requested review with the Appeals Council (Tr. 323-26, 500-04). The Appeals Council subsequently remanded the case for, inter alia, further consideration of Plaintiff's migraine headaches and obesity (Tr. 171-75), and a new ALJ held a hearing which Plaintiff, her attorney, and a VE attended (Tr. 83-113). That ALJ ruled that Plaintiff's disability ended on September 1, 2015 (Tr. 12-31), and the Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 527-29), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings:

3

1.   The most recent favorable medical decision finding that [Plaintiff] was disabled is the decision dated July 24, 2013.   This is known as the "comparison point decision" or CPD.

2.   At the time of the CPD, [Plaintiff] had the following medically determinable impairments: seizures and bipolar disorder.   These impairments were found to result in the residual functional capacity with the following limitation: an inability to sustain work activity on a regular and continuing basis . . . .

3.   Through the date of this decision, [Plaintiff] has not engaged in substantial gainful activity.

4.   The medical evidence establishes that, since September 1, 2015, [Plaintiff] has had the following medically determinable impairments: minor motor seizures, migraines, depression, bipolar disorder, and obesity. . . .

5.   Since September 1, 2015, [Plaintiff] has not had an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

6.   Medical improvement occurred on September 1, 2015.

. . .

7.   Since September 1, 2015, the impairments present at the time of the CPD decreased in medical severity to the point where [Plaintiff] has had a residual functional capacity to sustain basic work activities . . . .

8.   [Plaintiff's] medical improvement is related to the ability to work because it resulted in an increase in [Plaintiff's] residual functional capacity.

. . .

9.   Since September 1, 2015, [Plaintiff] has continued to have a severe impairment or combination of

4

impairments[:] . . . minor motor seizures, migraines, depression, bipolar disorder, and obesity . . . .

. . .

10. Based on the impairments present since September 1, 2015, [Plaintiff] has had the residual functional capacity to perform medium work . . . except she could never climb ladders, ropes, or scaffolds, work at unprotected heights, work around moving mechanical parts, or operate a motor vehicle. She could tolerate exposure to no more than moderate noise. She could tolerate frequent exposure to weather, humidity and wetness, dusts, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations. She requires a line of vision while communicating with others. She could perform simple, routine, and repetitive tasks not at a production rate pace (e.g., assembly line work) and make simple work-related decisions. She could occasionally interact with supervisors, coworkers, and the public.

. . .

11. Since September 1, 2015, [Plaintiff] has been unable to perform past relevant work.

. . .

15. Since September 1, 2105, considering [Plaintiff's] age, education, work experience, and residual functional capacity based on the impairments present since September 1, 2015, [Plaintiff] has been able to perform a significant number of jobs in the national economy.

. . .

16. [Plaintiff's] disability ended on September 1, 2015, and [Plaintiff] has not become disabled again since that date.

(Tr. 17–31 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such a] decision . . . is extremely limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If

there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" Hall v.

Harris, 658 F.2d 260, 264 (4th Cir. 1981) (quoting 42 U.S.C. § 423(d)(1)(A)).[4] "To regularize the adjudicative process, the [SSA] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id.

After a claimant qualifies for benefits under the Act, no presumption of continuing disability exists, see 42 U.S.C. § 423(f)(4); rather, the decision to award benefits remains subject to a periodic CDR, 20 C.F.R. § 404.1589. The SSA utilizes the prior determination granting benefits — the CPD — as a reference to evaluate whether any medical improvement has occurred relating to the claimant's ability to work. See 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594. To make this determination, the Commissioner employs an eight-step sequential evaluation process ("SEP"):

> 1) Is the claimant engaging in substantial gainful activity?

---

[4] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

8

2) If not, do the claimant's impairments meet or medically equal the severity of any listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App'x 1?

3) If not, has there been any medical improvement in the severity of the claimant's impairments?

4) If medical improvement has occurred, does such improvement relate to the claimant's ability to work?

5) If no medical improvement has occurred, does an exception apply?

6) If medical improvement relates to the claimant's ability to work, do the claimant's current impairments, singly or in combination, qualify as severe?

(7) If severe impairments exist, does the claimant's residual functional capacity ("RFC") permit the performance of past relevant work?

(8) If not, does the claimant have the RFC to perform other work existing in significant numbers in the national economy?

20 C.F.R. § 404.1594(f)(l)-(8).[5] If the Commissioner finds conclusively that a claimant qualifies as disabled at any point in this process, review does not proceed to the next step. See id.

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

9

## B.  Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he restrictions identified by the RFC [and the dispositive hypothetical question to the VE] do not account for [Plaintiff]'s moderate limitation in concentration, persistence, and pace (CPP)" (Docket Entry 14 at 9 (italics and single-spacing omitted));

2) "[t]he ALJ erred by rejecting the [opinions] of [Plaintiff]'s treating psychiatrist, Dr. [Brian] Wasserman" (id. at 11 (italics and single-spacing omitted));

3) "[t]he ALJ erred by failing to consider the opinions of treating physicians rendered prior to September 1, 2015, the alleged date of medical improvement" (id. at 16 (italics and single-spacing omitted)); and

4) "[t]he ALJ erred by providing insufficient reasons for giving little weight to statements by [Plaintiff]'s husband" (id. at 18 (italics and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (See Docket Entry 16 at 5-18.)

### 1. CPP

In Plaintiff's first assignment of error, she contends that "[t]he restrictions identified by the RFC [and the dispositive

10

hypothetical question to the VE] do not account for [Plaintiff]'s moderate limitation in . . . CPP[]." (Docket Entry 14 at 9 (italics and single-spacing omitted).) More specifically, Plaintiff maintains that, pursuant to Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), "restricting a claimant to simple, routine work, or unskilled work, does not account for a moderate limitation in CPP." (Docket Entry 14 at 9 (citing Mascio, 780 F.3d at 638).) Additionally, Plaintiff argues "that an ALJ commits error when he attempts to account for a moderate limitation in CPP by providing that the claimant is to do 'no work requiring a production rate or demand pace,' but does not define 'production rate.'" (Id. (citing Mischler v. Berryhill, 766 F. App'x 369, 376 (7th Cir. 2019), Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019), Dwayne D. v. Berryhill, Civ. No. 17-3809, 2019 WL 1317234, at *5 (D. Md. Mar. 22, 2019) (unpublished), and Butler v. Berryhill, No. 1:18CV59, 2019 WL 442377, at *1 (N.D. Ind. Feb. 4, 2019) (unpublished)).) Plaintiff further points out that, "[un]like the RFC, which at least attempted to define 'production rate pace[]'" by including the parenthetical "'(e.g., assembly line work)[,]'" the ALJ's dispositive hypothetical question to the VE "made no such attempt." (Id. at 10 (citing Tr. 110, and referencing Tr. 21).) For the reasons discussed below, Plaintiff's contentions lack merit.

11

The Fourth Circuit has indeed held that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]." <u>Mascio</u>, 780 F.3d at 638. However, as a neighboring district court has explained:

> <u>Mascio</u> does not broadly dictate that a claimant's moderate impairment in [CPP] <u>always</u> translates into a limitation in the RFC. Rather, <u>Mascio</u> underscores the ALJ's duty to adequately review the evidence and explain the decision . . . . An ALJ may account for a claimant's limitation with [CPP] by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

<u>Jones v. Colvin</u>, No. 7:14CV273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015) (magistrate judge's recommendation adopted by district judge) (unpublished) (emphasis added); <u>see also</u> <u>Hutton v. Colvin</u>, No. 2:14CV63, 2015 WL 3757204, at *3 (N.D.W. Va. June 16, 2015) (unpublished) (finding reliance on <u>Mascio</u> "misplaced," because ALJ "gave abundant explanation" for why the claimant could perform unskilled work despite moderate limitation in CPP, by highlighting his daily activities and treating physicians' opinions). Here, the ALJ's decision provides a sufficient explanation as to why restrictions to "simple, routine, and repetitive tasks [('SRRTs')] not at a production rate pace (e.g., assembly line work)" involving "simple work-related decisions" and

12

only "occasional[] interact[ion] with supervisors, coworkers, and the public" (Tr. 21) adequately accounted for Plaintiff's moderate deficit in CPP.

First, the ALJ discussed Plaintiff's testimony that "her mind races so much during manic episodes [] that she cannot think straight" and that she "ha[s] to state aloud each step she completes during these episodes." (<u>Id.</u>; <u>see also</u> Tr. 93.) However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [] not entirely consistent with the objective medical and other evidence for the reasons discussed in th[e] decision" (Tr. 22), and Plaintiff did not challenge the ALJ's assessment of Plaintiff's subjective symptom reporting (<u>see</u> Docket Entry 14).

Second, the ALJ summarized Plaintiff's mental health treatment and daily activities, making the following, pertinent observations:

- "[f]rom 2014 through September 2015, [Plaintiff]'s treating psychiatrists through Duke University Health Systems routinely observed [Plaintiff] with normal hygiene, good eye contact, a cooperative attitude, normal psychomotor behavior, normal speech, <u>intact attention/memory</u>, intact judgment/insight, and <u>normal thought processes/content</u>," and Plaintiff's primary care providers "routinely observed [Plaintiff] with a normal/pleasant mood and affect" and "assessed her bipolar disorder as 'stable' on current medication" (Tr. 23 (emphasis added) (citing Tr. 534, 537, 544, 547, 549, 555, 557, 562, 571, 573, 577, 590));

13

- Plaintiff did not receive "any emergent psychological treatment, except for one overnight hospitalization in 2017" (Tr. 26) involving "bizarre behavior (*i.e.*, panic and screaming[] . . . in the setting of medication noncompliance (i.e., not taking her Depakote for five days) and . . . [Plaintiff] admitted to consuming a marijuana gummy bear right before her symptoms began" (Tr. 25 (citing Tr. 987, 1120-21)); and

- Plaintiff "reported completing almost all her [online] college credits towards a degree in library sciences" (Tr. 24 (citing Tr. 557)), "enjoying being a stay-at-home mother of three school-aged children" (id. (citing Tr. 549, 552 938)), "exercising twice per day for 30 minutes" (Tr. 25 (citing Tr. 1082)), "volunteering at the library" (id. (citing Tr. 979)), "enjoying participating in Girl Scouts with her daughter" (id. (citing Tr. 1082)), and "completing household chores" (id. (citing Tr. 958)).

Those largely normal mental health findings and significant, varied daily activities lend support to the ALJ's conclusion that, despite moderate deficit in CPP, Plaintiff remained able to perform "[SRRTs] not at a production rate pace (e.g., assembly line work)" involving "simple work-related decisions" and only "occasional[] interact[ion] with supervisors, coworkers, and the public" (Tr. 21).

Third, the ALJ discussed and weighed the opinion evidence as it related to Plaintiff's ability to function mentally. (See Tr. 27-29.) In that regard, the ALJ gave "some weight" to the state agency psychological consultant at the reconsideration level of review (Tr. 27), who found that, notwithstanding moderate limitation in CPP (see Tr. 705), Plaintiff remained able to perform

"SRRTs" (Tr. 707) in a "low stress, low production work environment," with "limited interpersonal demands," and to "sustain and persist long enough to complete a workday" (Tr. 711 (emphasis added)). The Fourth Circuit has found an ALJ's reliance on a similar opinion from a state agency psychological consultant sufficient to account for moderate limitations in CPP under Mascio. See Sizemore v. Berryhill, 878 F.3d 72, 80–81 (4th Cir. 2017) (finding ALJ's crediting of consultant's opinion that the claimant "would generally be able to maintain [attention] for at least two [hours] at a time as needed to do simple, routine tasks" satisfied Mascio).

Fourth, the ALJ's non-production restriction, in and of itself, adequately accounts for Plaintiff's moderate limitation in CPP. See Grant v. Colvin, No. 1:15CV515, 2016 WL 4007606, at *9 (M.D.N.C. July 26, 2016) (unpublished) (finding non-production restriction "facially addresse[d] moderate . . . limitation in the claimant's ability to stay on task" (internal quotation marks omitted)), recommendation adopted, slip op. (M.D.N.C. Sept. 21, 2016) (Osteen, Jr., C.J.). Indeed, despite Plaintiff's arguments regarding the insufficiency of the ALJ's non-production restriction here, a review of recent decisions from the Fourth Circuit addressing non-production restrictions in the context of Mascio bolsters the conclusion that the ALJ's restrictions to

15

"[SRRTs] not at a production rate pace (e.g., assembly line work)"

involving "simple work-related decisions" and only "occasional[]

interact[ion] with supervisors, coworkers, and the public" (Tr.

21) properly accommodate Plaintiff's moderate limitation in CPP.

As another judge of this Court recently reasoned:

> In [Perry v. Berryhill, 765 F. App'x 869 (4th Cir.
> 2019)], the Fourth Circuit found fault with "the ALJ's
> reference to a 'non-production oriented work setting,'"
> as the Fourth Circuit "d[id] not know what the ALJ
> intended when she used that phrase," making it
> "difficult, if not impossible, to evaluate whether
> restricting [the plaintiff] to a 'non-production
> oriented work setting' properly accounted for [his]
> well-documented limitations in [CPP]." Perry, 765 F.
> App'x at 872. In so doing, the Fourth Circuit
> specifically distinguished its decision in Sizemore v.
> Berryhill, 878 F.2d 72 (4th Cir. 2017), where it "found
> that an ALJ had adequately explained a[n RFC] assessment
> that restricted the claimant, in part, to 'non-
> production jobs,'" as "the ALJ in Sizemore provided
> additional context, explaining that the claimant could
> perform work only in a 'low stress' setting, without any
> 'fast-paced work' or 'public contact,' to account for
> moderate limitations in [CPP]," which "descriptors
> helped to explain the restriction intended by the ALJ,
> and allowed [the Fourth Circuit] to evaluate whether
> that restriction adequately accounted for the claimant's
> limitations." Perry, 765 F. App'x at 872 n.1.

Ross v. Berryhill, No. 1:17CV1145, 2019 WL 1430129, at *1 (M.D.N.C.

Mar. 29, 2019) (unpublished) (Schroeder, C.J.) (emphasis added);

see also Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019)

(finding that ALJ's preclusion of "work 'requiring a production

rate or demand pace'" and "'crisis situations, complex decision

making, or constant changes in a routine setting'" did not suffice

16

under facts of that case).  As in <u>Ross</u> (and consistent with <u>Sizemore</u>, as construed in <u>Perry</u>), the ALJ here included the additional definition of "not at a production rate pace" as meaning no "assembly line work," and provided the further descriptors of "simple work-related decisions" and only "occasional[] interact[ion] with supervisors, coworkers, and the public" (Tr. 21).  Those descriptors "help[] to explain the restriction intended by the ALJ, and allow[ the Court] to evaluate whether that restriction adequately accounted for [Plaintiff's] limitations," <u>Perry</u>, 765 F. App'x at 872 n.1.

Fifth, although the ALJ did not include the additional descriptor "assembly line work" in his dispositive hypothetical question to the VE, the VE did not express <u>any</u> difficulty in understanding the meaning of the words "production rate pace" in responding to that hypothetical. (Tr. 109-11.)[6]  The VE provided three jobs that fit within the ALJ's non-production restriction, Hospital Cleaner, Counter Supply Worker, and Dining Room Attendant

---

[6] Significantly, the <u>DOT</u>'s definition of "light work" includes the words "production rate pace":

> [A] job should be rated [l]ight [w]ork . . . when the job requires working at a <u>production rate pace</u> entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.  NOTE: The constant stress and strain of maintaining a <u>production rate pace</u>, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

<u>DOT</u>, App'x C ("Components of the Definition Trailer"), § IV ("Physical Demands – Strength Rating"), 1991 WL 688702 (emphasis added).

(Tr. 110), and neither the corresponding job descriptions in the Dictionary of Occupational Titles ("DOT"), see DOT, No. 323.687-010 ("Cleaner, Hospital"), 1991 WL 672782 (G.P.O. 4th ed. rev. 1991) (involving "[c]lean[ing] hospital patient rooms, baths, laboratories, offices, halls, and other areas"); DOT, No. 319.687-010 ("Counter-Supply Worker"), 1991 WL 672772 (entailing "[r]eplenish[ing] food and equipment at steamtables and serving counters of cafeteria to facilitate service to patrons"); DOT, No. 311.677-010 ("Cafeteria Attendant"), 1991 WL 672694 (requiring "[c]arr[ying] trays from food counters to tables for cafeteria patrons," "[c]arr[ying] dirty dishes to kitchen," "[w]ip[ing] tables and seats," and "[s]et[ting] tables"), nor Plaintiff in brief (see Docket Entry 14 at 9-11) show that those jobs actually involve a production rate pace or assembly line work.

Sixth, at the hearing before the ALJ, Plaintiff failed to question the VE regarding the meaning of the phrase "production rate pace" or how the jobs the VE cited adhered to that restriction, despite the fact that she had the opportunity (through her attorney) to cross-examine the VE. (See Tr. 111-12.) As a result, Plaintiff has waived, in this Court, any challenge to the ALJ's reliance upon (and adoption of) the VE's testimony that the three jobs in question could accommodate the ALJ's non-production restriction. See Stepinski v. Astrue, No. CA 11-183, 2012 WL

18

3866678, at *9–10 (D.R.I. Aug. 6, 2012) (unpublished) ("The [c]ourt views unfavorably the silence of [the p]laintiff's counsel at the hearing regarding the omission about which he now complains. Reversal and remand . . . would encourage other counsel to remain silent in similar circumstances.  This [c]ourt is disinclined to provide such an incentive[] . . . [and] finds that [the p]laintiff waived this issue by failing to raise it before the ALJ." (internal citations omitted)), recommendation adopted, 2012 WL 3863812 (D.R.I. Sept. 5, 2012) (unpublished).

In short, Plaintiff's first assignment of error fails as a matter of law.

## 2. Opinions of Dr. Wasserman

Next, Plaintiff argues that "[t]he ALJ erred by rejecting the [opinions] of [Plaintiff]'s treating psychiatrist, Dr. Wasserman." (Docket Entry 14 at 11 (italics and single-spacing omitted).)  In particular, Plaintiff contends that the ALJ failed to "cite persuasive contradictory evidence in rejecting Dr. Wasserman's opinions" and "overlook[ed] that [Plaintiff] has [b]ipolar [d]isorder, an impairment which is 'by nature episodic and admits to regular fluctuations even under proper treatment.'" (Id. at 13 (quoting Jelinek v. Astrue, 662 F.3d 805, 814 (7th Cir. 2011)).) Those arguments fail to establish an entitlement to relief.

19

Plaintiff asserts that, "[t]o reject a treating physician's opinion, the ALJ's reasoning must cite persuasive contradictory evidence," citing Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). (Docket Entry 14 at 12.) However, Plaintiff's phrasing of the "treating physician rule" as including the "persuasive contradictory evidence" language no longer represents the governing standard. See Stroup v. Apfel, No. 96-1722, 205 F.3d 1334 (table), 2000 WL 216620, at *5 (4th Cir. Feb. 24, 2000) (unpublished) (expressly rejecting "persuasive contradictory evidence" standard and noting that "[t]he 1991 regulations supersede[d] the 'treating physician rule' from our prior case law"); Shrewsbury v. Chater, No. 94-2235, 68 F.3d 461 (table), 1995 WL 592236, at *2 n.5 (4th Cir. Oct. 6, 1995) (unpublished) (observing that, "[a]s regulations supersede contrary precedent, the cases cited by [the plaintiff] defining the scope of the 'treating physician rule' decided prior to [the 1991] regulations are not controlling" (internal citation omitted)); Brown v. Astrue, Civil Action No. CBD10-1238, 2013 WL 937549, at *4 (D. Md. Mar. 8, 2013) (unpublished) (deeming "persuasive contradictory evidence" a "defunct legal standard" in light of 1991 regulations); Benton v. Astrue, Civil Action No. 0:09-892-HFF-PJG, 2010 WL 3419272, at *1 (D.S.C. Aug. 30, 2010) (unpublished) (holding that 1991 regulation "supersedes any prior Fourth Circuit's common law

20

treating physician rule that is contrary to it"); <u>Winford v.</u> <u>Chater</u>, 917 F. Supp. 398, 400 (E.D. Va. 1996) (finding "persuasive contrary evidence . . . the wrong legal standard"); <u>Ward v. Chater</u>, 924 F. Supp. 53, 55-56 (W.D. Va. 1996) (recognizing that 1991 regulations supersede "persuasive contradictory evidence" standard).[7]

Under the governing standard, the treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. § 404.1527(c) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule also recognizes, however, that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. 20

---

[7] In <u>Johnson v. Barnhart</u>, 434 F.3d 650 (4th Cir. 2005), the Fourth Circuit stated that an ALJ <u>could</u> discredit treating physician opinion in light of "persuasive contrary evidence," <u>Johnson</u>, 434 F.3d at 654 n.5; however, that does not mean that <u>any</u> rationale for rejection of such opinion <u>must</u> cite persuasive contradictory evidence. <u>See, e.g.</u> <u>Craig</u>, 76 F.3d at 590 (recognizing that, if treating source's opinion "is not supported by clinical evidence <u>or</u> it is inconsistent with other <u>substantial</u> evidence, it should be accorded significantly less weight" (emphasis added)).

21

C.F.R. § 404.1527(c)(2)(ii).  Moreover, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2)-(4).  "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  Craig, 76 F.3d at 590 (emphasis added).

On October 6, 2015, Dr. Wasserman signed a "To Whom It May Concern" letter ("2015 Letter"), which states, in pertinent part, as follows:

> This letter is written by request of [Plaintiff] concerning her current functional status.
>
> I have been psychiatrist [sic] for [Plaintiff] since 6/2015 for her type 1 bipolar disorder.  At this time, [Plaintiff] continues to experience symptoms associated with her bipolar disorder.  Due to these symptoms, I would recommend that she remain on disability.

(Tr. 599.)  Under a year later, on August 4, 2016, Dr. Wasserman completed a second "To Whom It May Concern" letter ("2016 Letter"), opining as follows:

> This letter is written by request of [Plaintiff] concerning her current functional status.
>
> I have been the psychiatrist for [Plaintiff] since June 2015 for her type 1 bipolar disorder.  [Plaintiff] remains under treatment for her disorder and continues to experience cycles of debilitating symptoms including

22

> mood disturbances, excess or decreased energy, and sleep disturbances every three to four months. Previous and recent attempts at employment or extended volunteer experiences led to rapid decompensation in her psychiatric symptoms followed by several weeks of recovery. Due to these issues, [Plaintiff] has been unable to maintain employment and would benefit from continued disability.

(Tr. 918.)

Just over a month later, Dr. Wasserman completed a pre-printed form entitled "Medical Source Statement About What the Claimant Can Still Do Despite Mental Impairment(s)" ("MSS") (Tr. 912-15), indicating that Plaintiff's mental symptoms included appetite, sleep, and mood disturbance, personality change, emotional lability, psychomotor agitation or retardation, difficulty thinking or concentrating, social withdrawal, intrusive recollections of a traumatic experience, and hostility/irritability (Tr. 912). Dr. Wasserman opined that Plaintiff's bipolar symptoms caused her to suffer "[m]arked [l]oss" of her abilities to understand, remember, and carry out detailed instructions (Tr. 913), "[m]aintain attention and concentration for extended periods, i.e. 2 hour segments" (id.), "[c]omplete a normal workday or work week without interruptions from psychologically based symptoms" (id.), and "[p]erform at a consistent pace without an unreasonable number and length of rest periods" (id.), as well as "[m]oderate [l]oss" of her abilities to "[m]aintain regular attendance and be punctual" (id.), "[s]ustain

23

an ordinary routine without special supervision" (id.), "[w]ork in coordination with or proximity to others without being unduly distracted" (id.), "[g]et along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes" (Tr. 915), "[r]espond appropriately to changes in a routine work setting" (id.), and "[b]e aware of normal hazards and take appropriate precautions" (id.). According to Dr. Wasserman, Plaintiff's bipolar symptoms would cause "[s]light" limitation in Plaintiff's ability to maintain social functioning, would "[o]ften" cause "[d]eficiencies of [CPP] resulting in a failure to complete tasks in a timely manner," would result in "[r]epeated" episodes of decompensation, and would cause her to miss work more than three days per month. (Tr. 914.)

The ALJ accorded Dr. Wasserman's opinions "little weight" based upon the following rationale:

> In October 2015, [Dr. Wasserman] recommended [Plaintiff]
> remain "on disability" due to her bipolar symptoms. Dr.
> Wasserman may be a treating specialist, but he did not
> even begin treating [Plaintiff] until July 2015, which
> means he only treated [Plaintiff] for four months prior
> to rendering his opinion. Importantly, his examination
> of [Plaintiff] revealed entirely normal findings.
> Moreover, numerous examinations by [psychiatrist] Dr.
> [Thomas] Recore in 2014 and 2015 routinely revealed
> normal findings . . . . In addition, in June 2015, Dr.
> Recore noted [Plaintiff] was doing "quite well" on a
> simplified medication regimen and had "no complaints."
> In short, Dr. Wasserman's [2015 Letter] is inconsistent
> with the objective medical evidence. Finally, his [2015
> Letter] is inconsistent with [Plaintiff]'s reported
> activities of nearly completing a college degree in

24

library sciences while caring for her three minor children . . . . For these reasons, his opinion is accorded little weight.

For similar reasons, the extreme limitations found in Dr. Wasserman's [MSS and 2016 Letter] are also accorded little weight. For example, he opined [Plaintiff] "cycles" through "debilitating symptoms" such that even a recent attempt at employment resulted in "decompensation" and that [Plaintiff] would miss more than three days of work per month. However, this is highly inconsistent with Dr. Wasserman's numerous examinations of [Plaintiff] revealing normal psychiatric findings . . . . It is also inconsistent with [Plaintiff]'s reported activities of taking college courses and caring for three minor children. Finally, it is inconsistent with Dr. Wasserman's routine assessment that [Plaintiff] was doing well with "mild" mood fluctuations and decreased severity in cycling with Abilify . . . . For these reasons, his [MSS and 2016 Letter] are accorded little weight.

(Tr. 28 (internal citations omitted).)

Plaintiff first faults the ALJ for according little weight to Dr. Wasserman's 2015 Letter because "he lacked sufficient familiarity with [Plaintiff] and her condition" and for "assum[ing] that treating [Plaintiff] for four months was not enough." (Docket Entry 14 at 13 (citing Tr. 28).) According to Plaintiff, "[t]h[at] finding clearly usurps a treating [] psychiatrist's expertise; it is presumptuous of a layman ALJ to say that four months is too brief a period for a trained psychiatrist to reach a reasonable, reliable conclusion regarding a patient's mental impairments." (Id.)

25

Plaintiff's argument fails for two reasons.  First, the ALJ deemed Dr. Wasserman a "treating specialist" (Tr. 28), despite the fact that, at the time he signed the 2015 Letter, he had only treated Plaintiff on two occasions, July 7, 2015 (see Tr. 649 (characterizing treatment as Plaintiff's "first visit")), and October 6, 2015 (see Tr. 654), the day he signed the 2015 Letter (see Tr. 599).  See Williams v. Berryhill, No. 1:17CV16, 2017 WL 4083574, at *8 (M.D.N.C. Sept. 14, 2017) (unpublished) (expressing "doubt" whether medical source who had treated the plaintiff once at time of opinion qualified as treating physician under regulations), recommendation adopted, 2017 WL 5989201 (M.D.N.C. Dec. 1, 2017) (unpublished) (Biggs, J.), aff'd, 729 F. App'x 262 (4th Cir. 2018); see also 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen [a claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the SSA] will give the source's opinion more weight than [the SSA] would give it if it were from a nontreating source." (emphasis added)).  Second, even if Dr. Wasserman constituted a treating psychiatrist at the time of the 2015 Letter, the regulations require the ALJ to consider the length of the treatment relationship when determining how much weight to afford an opinion. See 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated [a claimant] and the more times [a

26

claimant] ha[s] been seen by a treating source, the more weight [an ALJ] will give to the source's medical opinion.").

Next, although Plaintiff deems the ALJ's reliance on Dr. Recore's observations that Plaintiff remained "'quite well'" with "'no complaints'" a "*facially* more defensible objection to Dr. Wasserman's opinion" (Docket Entry 14 at 13 (quoting Tr. 28)), Plaintiff nonetheless complains that the ALJ's rationale "overlook[ed] that [Plaintiff] has [b]ipolar [d]isorder, an impairment which is 'by nature episodic and admits to regular fluctuations even under proper treatment'" (id. (quoting Jelinek, 662 F.3d at 814, and citing Bauer v. Astrue, 532 F.3d 606 (7th Cir. 2008), Sorensen v. Barnhart, 69 F. App'x 864 (9th Cir. 2003), and Hunt v. Astrue, 889 F. Supp. 2d 1129, 1145 (E.D. Wis. 2012))).

As an initial matter, the ALJ expressly acknowledged the cyclical nature of Plaintiff's bipolar disorder (see Tr. 23-26), as well as Plaintiff's reports of the frequency and severity of her cycling (see Tr. 21), but found her statements not entirely consistent with the record evidence (see Tr. 22), a finding not challenged by Plaintiff here (see Docket Entry 14). Moreover, Plaintiff's argument would have more probative force if the ALJ had cherry-picked a few normal and/or mild mental health findings in Dr. Recore's records and overlooked more severe findings. See Sorensen, 69 F. App'x at 866 (rejecting ALJ's finding that treating

27

sources' records contradicted their disability opinions "because the[ records] contained references to [the plaintiff']s feeling and functioning better at certain times," and noting that, although the plaintiff's "symptoms sometimes improved in response to, for example, a new medication, [] they often worsened or plateaued later" (emphasis added)). Here, the ALJ relied on normal and/or mild mental health findings in the reports of both Dr. Recore and Dr. Wasserman, and noted, accurately, that Dr. Wasserman's opinions conflicted with the consistently normal findings in both doctors' records, as well as with Plaintiff's significant daily activities. (Tr. 28.)

Plaintiff next asserts that, "even if Dr. Recore's statements do irreconcilably conflict with Dr. Wasserman's, the ALJ's reasoning assumes without explanation that Dr. Recore's statements should prevail." (Docket Entry 14 at 14-15.) According to Plaintiff, "th[at] reasoning is insufficient; the ALJ must *explain* why Dr. Recore's conclusions, rather than Dr. Wasserman's, are more persuasive." (Id. at 15 (citing Casteel v. Colvin, No. 4:12CV445, 2013 WL 1316389, at *19 (E.D. Mo. Mar. 29, 2013) (unpublished)).) That argument falls short, because the ALJ did not evaluate any opinions from Dr. Recore and then accord more weight to Dr. Recore's opinions than to those of Dr. Wasserman. Instead, the ALJ merely noted, in compliance with the regulations

28

and Craig, that both Dr. Recore's and Dr. Wasserman's normal and/or mild findings on mental status examination conflicted with Dr. Wasserman's significant mental restrictions (Tr. 28). See Craig, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." (emphasis added)).

In sum, the ALJ did not err by according Dr. Wasserman's opinions little weight and supported his rationale for doing so with substantial evidence.

### 3. Medical Opinions Pre-Dating the CPD

In her third assignment of error, Plaintiff contends that "[t]he ALJ erred by failing to consider the opinions of treating physicians [Dr. L.D. Empting, Dr. Austin B. Hall, and Dr. Nerissa M. Price] rendered prior to September 1, 2015, the alleged date of medical improvement." (Docket Entry 14 at 16 (italics and single-spacing omitted) (referencing Tr. 28-29, 714-23, 724-25, 782-87).)[8] In that regard, Plaintiff asserts that, "although the ALJ said he gave th[o]se opinions 'little weight,' he apparently did not really consider them at all, for he did not repeat a word of their substance." (Id. (citing Tr. 28-29).) According to Plaintiff,

---

[8] Contrary to Plaintiff's representation, Dr. Empting did not qualify as Plaintiff's "treating physician" (Docket Entry 14 at 16). Dr. Empting performed a one-time, consultative neuropsychiatric evaluation of Plaintiff at the request of the SSA. (See Tr. 714-23.)

29

the Fourth Circuit has "rejected th[e] proposition" that medical opinions offered "outside of the relevant adjudicatory period [are] *ipso facto* irrelevant." (<u>Id.</u> at 16-17 (citing <u>Bird v. Commissioner of Soc. Sec. Admin.</u>, 699 F.3d 337 (4th Cir. 2012)) (internal quotation marks omitted).) Plaintiff emphasizes that, because her bipolar disorder qualified as "disabling *before* September 1, 2015, and since . . . [her] lifelong [b]ipolar [d]isorder [] is still reasonably likely to cause the symptoms she repeatedly alleged *after* September 1, 2015, it is clearly plausible that the factors that caused her disability before September 1, 2015, are still at work." (<u>Id.</u> at 17-18 (internal quotation marks omitted).) Plaintiff's third issue on review misses the mark.

The ALJ offered the following rationale for discounting the opinions in question:

> All opinions rendered prior to the date of medical improvement are accorded little weight [(Tr. 714-23 (Empting), 724-25 (Hall), 782-87 (Price))]. In short, these opinions assess [Plaintiff]'s functioning outside of the relevant adjudicatory period. In addition, they are largely remote and were rendered several years prior to the date of medical improvement. Further, they lacked the opportunity to consider [Plaintiff]'s recent medical treatment. For these reasons, these opinions are collectively accorded little weight.

(Tr. 28-29.) Contrary to Plaintiff's contentions, the ALJ did not violate <u>Bird</u> or otherwise err by discounting the opinions at issue.

As an initial matter, because Plaintiff did not further appeal the ALJ decision denying benefits dated May 26, 2011 (<u>see</u> Tr. 41,

59, 85, 498), and instead filed a new DIB application on June 27, 2011 (see Tr. 382-85), res judicata applies to the period including and preceding the ALJ's denial decision of May 26, 2011. See Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 476 n.4 (4th Cir. 1999) (noting that, "to the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of [claim] preclusion apply with full force" and finding ALJ's dismissal of claims relating to previously adjudicated period "entirely proper").[9]   Here, Dr. Empting conducted his consultative neuropsychiatric evaluation of Plaintiff on March 18, 2011 (see Tr. 714), and Dr. Hall dated his "To Whom It May Concern" letter April 15, 2011 (Tr. 724). Because both of those opinions fall within the previously adjudicated time period covered by res judicata, the ALJ did not err by discounting those opinions because they "assess [Plaintiff]'s functioning outside of the relevant adjudicatory period" (Tr. 28).[10]

---

[9] None of the ALJs who issued decisions after the denial decision of May 26, 2011, expressly applied res judicata to the period including and preceding May 26, 2011 (see Tr. 12-31, 134-43, 146-64), because, as stated above, Plaintiff amended her onset date to May 27, 2011 (see Tr. 41, 138, 384).

[10] Notably, neither the ALJ who determined in a decision dated July 24, 2013, that Plaintiff qualified as disabled as of May 27, 2011, nor the ALJ who issued the decision on May 1, 2017, finding that Plaintiff's disability ended on September 23, 2015, discussed (let alone weighed) the opinions of Drs. Empting and Hall. (See Tr. 134-43, 146-64.)  Furthermore, neither Plaintiff's counsel in the request for review of the ALJ decision of May 1, 2017, nor the Appeals Council in remanding the matter, faulted the ALJ for not discussing and/or weighing the opinions in question. (See Tr. 171-75, 323-36, 500-04.)

31

Dr. Price's MSS dated August 1, 2011 (see Tr. 782-86), presents a different question, because she offered her opinion approximately two months into the CPD (see Tr. 782), and the ALJ who found that Plaintiff qualified as disabled as of May 27, 2011, both discussed Dr. Price's opinion and assigned it "great weight" (Tr. 141). Because Dr. Price's MSS formed a significant part of the rationale undergirding the CPD, the ALJ's decision to discount Dr. Price's opinions because they "assess [Plaintiff]'s functioning outside of the relevant adjudicatory period" (Tr. 28) constitutes error.

Further consideration of the time period and circumstances covered by Dr. Price's MSS, however, should persuade the Court to find such error harmless. See generally Bishop v. Commissioner of Soc. Sec., 583 F. App'x 65, 67 (4th Cir. 2014) ("[A]ny error is reviewed under the harmless error doctrine."); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Dr. Price noted on the MSS, dated August 1, 2011, that she had treated Plaintiff "since Feb[ruary] 2011" (see Tr. 782), and the record contains five treatment records from Dr. Price dating from March 22, 2011, to July 12, 2011, with only the July 2011 visit falling

32

within the CPD (see Tr. 726-27, 757-58, 759-60, 761-62, 763-64). Those records further reflect that Dr. Price treated Plaintiff during a time of heightened stress triggered by a burglary of Plaintiff's home, an ensuing move to a new home, and Plaintiff's pregnancy. (See id.) Indeed, Dr. Price noted on her MSS that Plaintiff's pregnancy "limited [] the medications she c[ould] tolerate" to treat her psychiatric symptoms. (Tr. 783.) In light of those circumstances, the Court should conclude that remanding the case for a more complete explanation by the ALJ for discounting Dr. Price's opinions would not result in a favorable outcome for Plaintiff.

Moreover, Plaintiff's reliance on Bird falls short. In that case, the plaintiff "d[id] not have any medical records dating before his [date last insured ('DLI') for benefits]" of March 31, 2005. Bird, 699 F.3d at 341 (emphasis added). "In July 2007, [the plaintiff] was evaluated by . . . a licensed clinical psychologist, who concluded that [the plaintiff wa]s not capable of relating to supervisors or co-workers at any level." Id. "The ALJ assigned little weight to the [psychologist's opinions] on the basis that [they] failed to reflect [the plaintiff]'s pre-DLI condition." Id. The Fourth Circuit concluded that "[t]he ALJ's failure to give retrospective consideration to the [psychologist's opinion] created after [the plaintiff]'s DLI was an error of law,"

33

because that evidence "provided a sufficient linkage 'reflective of a possible earlier and progressive degeneration.'" Id. at 342 (quoting Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)).

Here, unlike in Bird, the record contains a significant amount of mental health treatment records, as well as three new consultative examinations, post-dating the CPD, which support the ALJ's finding that Plaintiff's functioning improved during the post-CPD period (see Tr. 530-694, 895-939, 942-46, 949-1189). See Emrich v. Colvin, 90 F. Supp. 3d 480, 487 (M.D.N.C. 2015) ("This case is not like Bird. There is substantial evidence in the record concerning [the plaintiff]'s pre-DLI condition."). Indeed, as the Commissioner notes, far from showing that Plaintiff's condition worsened over time, the opinions from Drs. Empting, Hall, and Price actually "demonstrate the stark contrast between [Plaintiff's] disabling condition in 2011 and the remarkable improvement that she made in 2015." (Docket Entry 16 at 17.)

Simply put, Plaintiff's third issue on review falls short.

#### 4. Third Party Function Reports

Lastly, Plaintiff faults the ALJ for "providing insufficient reasons for giving little weight to statements from [Plaintiff]'s husband." (Docket Entry 14 at 18 (italics and single-spacing omitted) (referencing Tr. 29).) More specifically, Plaintiff challenges the ALJ's rationale that Plaintiff's husband "does not

34

specialize in psychiatry or psychology" as "indefensible." (Id. at 19 (quoting Tr. 29).) According to Plaintiff, her husband's statements "are the kinds of opinions drawn from everyday, rational observations that courts routinely find to be admissible as lay opinion evidence" (id. (citing Fed. R. Evid. 701)), and "the evidentiary rules are greatly relaxed, not constricted, in [] administrative hearings [before ALJs]" (id. at 20). Plaintiff further argues that, "even if the ALJ rightly concluded that [Plaintiff's husband] was incorrect" in stating that Plaintiff could only pay attention for a few minutes, "th[a]t was no reason to dismiss [all of the opinions of Plaintiff's husband] as having 'little weight.'" (Id. (quoting Tr. 29, and referencing Tr. 454).) Those arguments ultimately fail to carry the day.

The ALJ provided the following analysis of the opinions of Plaintiff's husband:

> Although the Third Party Function Reports completed by [Plaintiff]'s husband . . . generally corroborate [Plaintiff]'s allegations, [her husband] does not specialize in psychiatry or psychology. [(Tr. 427-36, 447-56, 498-99.)] In addition, his extreme reports (e.g., [Plaintiff] can only pay attention for a few minutes) are inconsistent with numerous clinical examinations revealing normal findings, no psychological counseling sessions, and only one emergent psychological visit in the setting of [marijuana] use . . . . Similarly, the record does not reflect a single emergency room visit for intractable migraines since the date of medical improvement. For these reasons, [Plaintiff's husband's] opinion is accorded little weight.

35

(Tr 29.) Contrary to Plaintiff's contentions, the ALJ's above-quoted analysis provided sufficient reasons supported by substantial evidence for discounting the opinions in question.

As an initial matter, the ALJ's observation that Plaintiff's husband "d[id] not specialize in psychiatry or psychology" (id.), although an apparently accurate statement, does not constitute a particularly compelling consideration for an ALJ assessing the opinions of a non-medical source, see Social Security Ruling 06-03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 71 F.R. 45593-03, 45596 (Aug. 9, 2006) (noting that, in evaluating "[o]pinions from 'non-medical sources' who have seen [a claimant] in their professional capacity . . . such as teachers, counselors, and social workers . . . and other non-medical professionals, it would be appropriate [for ALJs] to consider such factors as . . . the source's qualifications[ and] . . . area of specialty or expertise," but not including such factors for ALJs "considering evidence from 'non-medical sources' who have not seen [a claimant] in a professional capacity . . ., such as spouses, parents, friends, and neighbors"). However, the ALJ also discounted the opinions as "inconsistent" with other evidence and provided examples. (Tr.

36

29.) Moreover, the ALJ's inclusion of the parenthetical, "e.g., [Plaintiff] can only pay attention for a few minutes," makes clear that the ALJ did not discount <u>all</u> of the opinions of Plaintiff's husband solely on the basis of his assessment of Plaintiff's attention span, but rather highlighted that assessment to exemplify the extent to which those opinions conflicted with the other record evidence. (<u>Id.</u>)

Simply put, the ALJ did not reversibly err by discounting the opinions of Plaintiff's husband.

### III. CONCLUSION

Plaintiff has not established any errors warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 13) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 21, 2020